**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 24-5277**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

AXEL DIEGELMANN; FRITZ DIEGELMANN; RHEINGOLD
EDELMETALL AG; RHEINGOLD EDELMETALL GMBH; and
LIEMETA AG,

Plaintiffs-Appellants,

v.

SCOTT BESSENT, in his official capacity as Secretary of the United States
Department of the Treasury; LISA PALLUCONI, in her official capacity as
Acting Director of the Office of Foreign Assets Control; UNITED STATES
DEPARTMENT OF TREASURY; and UNITED STATES DEPARTMENT
OF TREASURY OFFICE OF FOREIGN ASSETS CONTROL,

Defendants-Appellees.

————————————

On Appeal from the United States District Court
for the District of Columbia

————————————

**BRIEF FOR APPELLEES**

————————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

SHARON SWINGLE
BENJAMIN M. SHULTZ
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7211*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3518*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A. Parties and Amici.** Plaintiffs-Appellants are Axel Diegelmann, Fritz Diegelmann, Rheingold Edelmetall AG, Rheingold Edelmetall GmbH, and Liemeta AG. Defendants-Appellees are Scott Bessent, in his official capacity as Secretary of the United States Department of the Treasury; the United States Department of the Treasury; Lisa Palluconi, in her official capacity as Acting Director of the Office of Foreign Assets Control; and the United States Department of the Treasury's Office of Foreign Assets Control.[1] There were no amici in the district court, and undersigned counsel is unaware of any amici on appeal.

**B. Rulings Under Review.** Appellants appeal from a November 25, 2024 ruling by the district court (Hon. James E. Boasberg). The decision is not currently reported, but it is available on Westlaw at *Diegelmann v. Yellen*, No. 24-1090, 2024 WL 4880468 (D.D.C. Nov. 25, 2024), and in the Joint Appendix at pages JA199-213.

---

[1] Under Fed. R. App. P. 43(c)(2), Scott Bessent is automatically substituted for Janet Yellen, and Lisa Palluconi is automatically substituted for Bradley Smith.

**C. Related Cases.** This case has not previously been before this Court or any other court, and counsel is unaware of any related cases within the meaning of this Court's rules.

*/s/ Benjamin M. Shultz*
Attorney for Appellees

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION .............................................................. 1

STATEMENT OF THE ISSUES ................................................................. 1

PERTINENT STATUTES AND REGULATIONS ..................................... 2

STATEMENT OF THE CASE ................................................................... 2

    A.   Statutory Background ................................................................ 2

    B.   Factual Background ................................................................... 7

    C.   Prior Proceedings ...................................................................... 9

SUMMARY OF ARGUMENT ................................................................. 10

STANDARD OF REVIEW ....................................................................... 13

ARGUMENT ............................................................................................ 15

I.    OFAC Properly Interpreted The Phrase "Metals And Mining Sector" As Used In Its Own Federal Register Notice ..................................................................................................... 15

II.   OFAC's Designations Were Supported By Substantial Evidence ............................................................................................ 33

CONCLUSION ........................................................................................ 37

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Abreu v. Howard Univ.*,
  93 F.4th 498 (D.C. Cir. 2024) .................................................. 25

*Ali v. Federal Bureau of Prisons*,
  552 U.S. 214 (2008) ................................................................. 26

*Bello v. Gacki*,
  94 F.4th 1067 (D.C. Cir. 2024) .......................................... 23, 35

*Fares v. Smith*,
  901 F.3d 315 (D.C. Cir. 2018) ............................................ 33, 34

*FTC v. Tarriff*,
  584 F.3d 1088 (D.C. Cir. 2009) .......................................... 18-19

*Government of Virgin Islands v. Edwards*,
  903 F.2d 267 (3d Cir. 1990) .................................................... 28

*Herbert Rosenthal Jewelry Corp. v. Honora Jewelry Co.*,
  509 F.2d 64 (2d Cir. 1974) ...................................................... 28

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
  333 F.3d 156 (D.C. Cir. 2003) ................................................ 14

*Huashan Zhang v. U.S. Citizenship & Immigration Servs.*,
  978 F.3d 1314 (D.C. Cir. 2020) .............................................. 18

*Islamic Am. Relief Agency v. Gonzales*,
  477 F.3d 728 (D.C. Cir. 2007) ............................................ 13-14

*iTech U.S., Inc. v. Renaud*,
  5 F.4th 59 (D.C. Cir. 2021) ..................................................... 26

*Keepseagle v. Perdue*,
  856 F.3d 1039 (D.C. Cir. 2017) .............................................. 25

*Keepseagle v. Vilsack*,
  815 F.3d 28 (D.C. Cir. 2016) .................................................. 25

*Medical Marijuana, Inc. v. Horn*,
  145 S. Ct. 931 (2025) .............................................................. 22

*National Org. for Women v. Social Sec. Admin.*,
   736 F.2d 727 (D.C. Cir. 1984) ................................................. 14

*Omega SA, In re*,
   494 F.3d 1362 (Fed. Cir. 2007) ............................................... 28

*Theodore Roosevelt Conservation P'ship v. Salazar*,
   616 F.3d 497 (D.C. Cir. 2010) ................................................ 13

*United States v. 218 ½ Carats Loose Emeralds*,
   153 F. 643 (S.D.N.Y. 1907) ................................................... 28

*Zevallos v. Obama*,
   793 F.3d 106 (D.C. Cir. 2015) ................................................ 15

**Statutes:**

Administrative Procedure Act (APA),
   5 U.S.C. § 706(2) .............................................................. 13

International Emergency Economic Powers Act:
   50 U.S.C. § 1701 *et seq.* ...................................................... 2
      50 U.S.C. § 1701(a) ......................................................... 2
      50 U.S.C. § 1702(a)(1) ...................................................... 2
      50 U.S.C. § 1702(a)(1)(B) ................................................... 2
      50 U.S.C. § 1702(c) ..................................................... 6, 33

28 U.S.C. § 1291 ................................................................. 1

28 U.S.C. § 1331 ................................................................. 1

**Regulations:**

31 C.F.R. § 501.807 ............................................................. 7

31 C.F.R. § 501.807(a) .......................................................... 7

31 C.F.R. § 501.807(b)(3) ....................................................... 7

31 C.F.R. § 587.802 ............................................................. 3

31 C.F.R. § 589.325 ........................................................... 4, 9

**Other Authorities:**

Britannica, *Gold Processing: Refining*, https://perma.cc/5YDJ-7U9R ............ 26

Elemetal, *America's Largest Precious Metals Refinery: How to Refine With Elemetal*, https://perma.cc/478G-Z3J9 .................................. 26

86 Fed. Reg. 20249 (Apr. 19, 2021) ............................................. 3, 15, 23, 32

87 Fed. Reg. 14381 (Mar. 11, 2022) ....................................... 30-31

87 Fed. Reg. 32303 (May 31, 2022) ........................................... 15

87 Fed. Reg. 32307 (May 31, 2022) ........................................... 15

87 Fed. Reg. 56590 (Sept. 15, 2022) ......................................... 31

88 Fed. Reg. 16887 (Mar. 21, 2023) ................................... 4, 15, 19

88 Fed. Reg. 36645 (June 5, 2023) ........................................... 15

Garfield Refining, *What Is Precious Metals Refining*, https://perma.cc/PQC4-7XLD ............................................. 26

Health Product Declaration Collaborative:

*Special Condition: Geological Material* (Feb. 23, 2018), https://www.hpd-collaborative.org/wp-content/uploads/2018/07/SpecialCondition_GeologicalMaterial.pdf ........................29-30

*The HPD Open Standard*, https://perma.cc/3MCR-5SGU ........................ 29

Law Insider, *Geologic Material definition*, https://perma.cc/D48Y-DBP8 ............................................. 29

OFAC, U.S. Dep't of the Treasury:

*Determination Pursuant to Section 1(a)(i) of Executive Order 14024: Metals and Mining Sector of the Russian Federation Economy* (Feb. 24, 2023), https://ofac.treasury.gov/media/931336/download?inline ................... 4

*Iran Sanctions: FAQ 831* (Dec. 7, 2020),
    https://perma.cc/6JXQ-5S39 ............................................................ 29

*Russian Harmful Foreign Activities Sanctions: FAQ 980*
    (Feb. 24, 2022), https://perma.cc/3YJU-PVKC ................................. 31

*Russian Harmful Foreign Activities Sanctions: FAQ 1029*
    (last updated June 28, 2022), https://perma.cc/V38E-BJYG ............... 31

*Russian Harmful Foreign*
    *Activities Sanctions: FAQ 1070* (last updated Dec. 22, 2023),
    https://perma.cc/YZB3-E3PR .......................................................... 31

*Russian Harmful Foreign Activities Sanctions: FAQ 1115*
    (Feb. 24, 2023), https://perma.cc/JKD5-AGBU ................. 4, 25, 28, 30

*Russian Harmful Foreign Activities Sanctions: FAQ 1117*
    (Feb. 24, 2023), https://perma.cc/J7SK-LEU9 ......................... 5, 19, 20

Press Release, U.S. Dep't of the Treasury, *Targeting Key Sectors,*
*Evasion Efforts, and Military Supplies, Treasury Expands and*
*Intensifies Sanctions Against Russia* (Feb. 24, 2023),
https://perma.cc/G3EU-6Q78 ................................................. 5, 6, 20, 21

*Procure*:

    American Heritage Dictionary of the English Language
        (5th ed. 2022), https://perma.cc/RN4B-WLUG ............................ 18, 22

    Cambridge Advanced Learner's Dictionary & Thesaurus
        (last accessed May 22, 2025),
        https://dictionary.cambridge.org/us/dictionary/english/
    procure?q=procuring ............................................................... 18

    Merriam-Webster (last accessed May 16, 2025),
        https://perma.cc/2XAA-BLZP ....................................................... 18

*Procurement*:

    Cambridge Advanced Learner's Dictionary & Thesaurus
        (last accessed May 22, 2025), https://dictionary.cambridge.org/
    dictionary/english/procurement ........................................................ 22

Merriam-Webster (last accessed May 16, 2025),
https://www.merriam-webster.com/dictionary/procurement .............. 22

The Natural Sapphire Company, *Platinum Mining & Refining*,
https://perma.cc/ESL7-JLAE ..........................................................26, 26

U.S. Energy Information Administration, *Coal Explained*
(last updated Feb. 16, 2023), https://perma.cc/PXX4-TJP7 ................... 28

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| FAQ | Frequently Asked Question |
| OFAC | Office of Foreign Assets Control |

## STATEMENT OF JURISDICTION

Plaintiffs' complaint challenged a decision by the Treasury Department's Office of Foreign Assets Control (OFAC) to block transactions in plaintiffs' property, and they invoked the district court's jurisdiction under 28 U.S.C. § 1331.  JA6, JA21-22.[1]  The district court entered final judgment for OFAC on November 25, 2024.  *See* JA198.  Plaintiffs timely noticed an appeal on December 4, 2024.  JA214.  This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

OFAC may sanction individuals who have operated in the "metals and mining sector" of the Russian economy.  Plaintiffs are European precious metals traders and their associated companies.  In 2024, OFAC sanctioned some of these plaintiffs after determining that they assisted Russian clients by buying and selling precious metals in circumvention of international sanctions and that they worked with Russia-based metals companies to disguise the origin of Russian precious metals.  The questions presented are:

---

[1] Citations to the Joint Appendix are abbreviated "JA[page#]." Citations to the Ex Parte Appendix, which contains classified material filed *ex parte* with the district court, are abbreviated "EA[page#]."  Citations to the district court's numbered docket entries are abbreviated "DE[#] at [page#]."

1) Whether OFAC acted arbitrarily and capriciously when it concluded that three of the plaintiffs had operated in the "metals and mining sector" of the Russian economy.

2) Whether OFAC's determination was supported by substantial evidence.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

1.  Through the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*, Congress has given the President a variety of powers to "deal with any unusual and extraordinary" foreign threat to "the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." *Id.* § 1701(a). Subject to various exemptions, those powers include the authority to prevent "transactions involving[] any property" in which a foreign national has an interest, subject to U.S. jurisdiction. *See id.* § 1702(a)(1)(B). The President also has authority to prescribe implementing regulations. *See id.* § 1702(a)(1).

2

In 2021, the President invoked his powers under the International Emergency Economic Powers Act to issue Executive Order 14024. *See* 86 Fed. Reg. 20249 (Apr. 19, 2021). That order recognized that various "harmful foreign activities of the Government of the Russian Federation" constituted "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and so the President declared a national emergency "to deal with that threat." *Id.* at 20249.

Subject to U.S. jurisdiction, Executive Order 14024 blocks "[a]ll property and interests in property" of any person "determined by the [Treasury] Secretary . . . to operate or have operated" in the technology or defense sectors of the Russian Federation economy, or "any other sector of the Russian Federation economy as may be determined by the [Treasury] Secretary." 86 Fed. Reg. at 20249. The order also blocks the property of any person or entity the Secretary determines is "owned or controlled by" a person whose property is blocked under the order, or who has "acted or purported to act for or on behalf of" such a person. *Id.* at 20250. And the order authorizes the Secretary "to take such actions, including the promulgation of rules and regulations" the Secretary deems necessary to carry out the order. *Id.* at 20252.

The Secretary has delegated his powers under the Executive Order to OFAC, a Treasury component. *See* 31 C.F.R. § 587.802. Exercising those

powers, OFAC determined in 2023 that the relevant provisions of the order would apply to "the metals and mining sector of the Russian Federation economy." 88 Fed. Reg. 16887 (Mar. 21, 2023).[2]

Concurrently, OFAC issued guidance on its website in the form of a Frequently Asked Question (FAQ), *see* OFAC, U.S. Dep't of the Treasury, *Russian Harmful Foreign Activities Sanctions: FAQ 1115* (Feb. 24, 2023), https://perma.cc/JKD5-AGBU (FAQ 1115). That guidance explained that for purposes of OFAC's sectoral determination, OFAC anticipated publishing regulations

> defining the term "metals and mining sector of the Russian Federation economy" to include any act, process, or industry of extracting, at the surface or underground, ores, coal, precious stones, or any other minerals or geological materials in the Russian Federation, or any act of procuring, processing, manufacturing, or refining such geological materials, or transporting them to, from, or within the Russian Federation.

*Id.* OFAC further noted that this was the same definition OFAC had used for the identical term in its Ukraine/Russia-related Sanctions Regulations. *Id.*; *see also* 31 C.F.R. § 589.325.

---

[2] Although OFAC's sector determination was not published in the Federal Register until March 2023, the determination itself was made on February 24, 2023, and put on OFAC's website. *See* OFAC, U.S. Dep't of the Treasury, *Determination Pursuant to Section 1(a)(i) of Executive Order 14024: Metals and Mining Sector of the Russian Federation Economy* (Feb. 24, 2023), https://ofac.treasury.gov/media/931336/download?inline.

Also concurrent with this sectoral determination, OFAC issued additional guidance through its FAQ 1117, *see* OFAC, U.S. Dep't of the Treasury, *Russian Harmful Foreign Activities Sanctions: FAQ 1117* (Feb. 24, 2023), https://perma.cc/J7SK-LEU9 (FAQ 1117). The question for this FAQ asked whether a "company [that] provides goods or services to, or engages in trade with, persons that operate or have operated in the metals and mining sector of" the Russian economy risks "being sanctioned by OFAC." *Id.* OFAC's answer was that its determination "authorizes sanctions on any person determined to operate or have operated in the metals and mining sector of the Russian Federation economy," but OFAC did "not intend to target persons for operating" in that sector "where the provision of goods or services is solely for the safety and care of personnel, protection of human life, prevention of accidents or injuries, maintenance or repair necessary to avoid environmental or other significant damage, or activities related to environmental mitigation or remediation." *Id.*

OFAC also issued a press release on the same day it issued its sectoral determination. *See* Press Release, U.S. Dep't of the Treasury, *Targeting Key Sectors, Evasion Efforts, and Military Supplies, Treasury Expands and Intensifies Sanctions Against Russia* (Feb. 24, 2023), https://perma.cc/G3EU-6Q78. The release explained that OFAC had made its sectoral determination "to diminish

Russia's ability to continue" its war against Ukraine "and to procure the resources used to support it." *Id.* OFAC additionally explained that its goal was to "further isolate[] Russia from the international economy" and to "hinder[] Russia's ability to obtain the capital, materials, technology, and support that sustain its war against Ukraine." *Id.* OFAC noted that by including the metals and mining sector, it was helping impose "economic costs on Russia" and was complementing existing sanctions covering a broad array of other designated sectors, including financial services, technology, aerospace, marine, electronics, and defense and related material. *Id.*

2. When OFAC sanctions an entity under the International Emergency Economic Powers Act, that entity may ordinarily pursue judicial review under the Administrative Procedure Act (APA). In some cases, this review must account for the fact that OFAC's designations can rely on classified and other sensitive information. The International Emergency Economic Powers Act expressly notes that when the government relies on classified information, and an affected entity thereafter seeks judicial review, the classified information "may be submitted to the reviewing court ex parte and in camera." 50 U.S.C. § 1702(c).

An entity sanctioned by OFAC also has the option to petition the agency "for administrative reconsideration" of the designation by submitting

6

"arguments or evidence that the person believes establishes that insufficient basis exists for the sanction or that the circumstances resulting in the sanction no longer apply."  31 C.F.R. § 501.807(a).  After conducting a review, OFAC will "provide a written decision" to the person.  *Id.* § 501.807(b)(3).  OFAC's regulations do not limit the number of times a person may seek to challenge his designation administratively.  *See generally id.* § 501.807.

### B.    Factual Background

Plaintiffs in this case are Axel Diegelmann (Axel), Fritz Diegelmann (Fritz), Rheingold Edelmetall AG, Rheingold Edelmetall GmbH, and Liemeta AG.  JA6-7.  According to plaintiffs, Axel and Fritz are German citizens who reside in Lichtenstein, JA6-7, where they "have operated in the precious metals industry for over a decade" by focusing on "the trading of precious metals, including the acquisition and sourcing of such metals, as well as their sale," JA8.  They also store precious metals in secure facilities they operate.  JA8.  Axel and Fritz conduct these activities through Rheingold Edelmetall AG, a Lichtenstein-based company owned by Axel that employs Fritz.  JA7-9.

On February 23, 2024, as part of a broader action targeting numerous entities under Executive Order 14024, OFAC blocked the property of Axel, Fritz, Rheingold Edelmetall AG, and the other two plaintiffs.  JA26, 27, 45, 75.  Based on information presented in an evidentiary memorandum with

7

accompanying exhibits, OFAC determined that Axel, Fritz, and Rheingold Edelmetall AG "operate or have operated in the metals and mining sector of the Russian Federation economy," JA101, rendering it appropriate to sanction them.  OFAC also determined that it was appropriate to sanction Rheingold Edelmetall GmbH and Liemeta AG, since both companies were owned or controlled by an individual or entity that OFAC was concurrently sanctioning (Rheingold Edelmetall AG and Axel, respectively).  JA101-02.

OFAC's memo includes approximately seven pages of analysis further explaining the basis for its conclusions regarding Axel, Fritz, and Rheingold Edelmetall AG.  *See* JA103-10.  Much of that material is classified and hence is redacted in the version of the memo produced to plaintiffs.  *See* JA103-10.  The unredacted portions give further information about Axel and Fritz's senior roles with Rheingold Edelmetall AG.  *See* JA105-08.

OFAC's action was also accompanied by a public press release.  That release explained that Axel and Rheingold Edelmetall AG had "collaborated with Russia-based metals companies to disguise the origin of Russian precious metals," and that the two of them and Fritz had "assisted Russian clients" in money laundering "by buying and selling precious metals for cash, illicitly circumventing international sanctions."  JA95.  The release further noted that Rheingold Edelmetall AG had previously taken "steps to obfuscate" the

8

beneficiaries of assorted transactions and that the precious metals were owned by Russian clients. JA95. The release also observed that Bernd Guenter Diegelmann, a Rheingold Edelmetall AG employee based in the United Arab Emirates, had worked to arrange the sale of Russian precious stones in the United Arab Emirates. JA95.

### C.    Prior Proceedings

1. In April 2024, plaintiffs filed suit against OFAC, challenging the agency's decision to designate them under Executive Order 14024. OFAC produced a redacted version of the administrative record to plaintiffs (with classified information removed), *see* DE10-1 at 2, and the parties thereafter cross-moved for summary judgment. OFAC also lodged an unredacted version of the administrative record—which contained classified information— with the district court for the court's *ex parte*, *in camera* review. *See* JA24.

Plaintiffs' main argument in the district court was that their metals trading activities did not count as operating in the "metals and mining sector." The district court disagreed, explaining that OFAC had defined the term "metals and mining sector" as including "any act of procuring" precious metals from the Russian Federation. JA204 (quoting 31 C.F.R. § 589.325). The court further explained that it made sense to give the term "procuring" its ordinary meaning of "obtaining something, especially through particular

9

effort," rather than an industry-specific definition that plaintiffs had advocated

for.  JA205-07.  And since OFAC's evidence demonstrated that plaintiffs had

"assisted in the purchase and sale of Russian precious metals" and had

"bought and sold precious metals on behalf of Russian clients," plaintiffs had

procured precious metals from Russia and therefore had operated in the metals

and mining sector of the Russian Federation economy.  JA207-10.

The district court further concluded that OFAC's designation was

supported by substantial evidence.  The court explained that it had reviewed

the classified version of the administrative record that was lodged *ex parte*,

alongside the unclassified materials, and found sufficient evidence that

plaintiffs had operated in Russia's metals and mining sector.  JA210-13.  The

court also observed that plaintiffs remained free to pursue OFAC's

administrative reconsideration process, under which they would have the

opportunity to present arguments and evidence for why they believed their

designations were no longer necessary.  *See* JA213.

## SUMMARY OF ARGUMENT

The main question in this case is whether plaintiffs have operated in the

"metals and mining sector" of Russia's economy.  The resolution of that issue

is straightforward.  By their own admission, the lead plaintiffs are European

precious-metals traders who "have operated in the precious metals industry"

for years by buying and selling precious metals. And as OFAC explained at the time it designated them, these plaintiffs had previously engaged in buying and selling precious metals on behalf of Russian clients—even to the point that they helped Russian clients launder funds by buying and selling precious metals for cash, illicitly circumventing international sanctions. OFAC thus reasonably determined that plaintiffs had operated in the metals and mining sector of Russia's economy.

OFAC's common-sense conclusion is further buttressed by contemporary guidance the agency issued about what it means to operate in Russia's metals and mining sector. Among other things, that guidance noted that an individual can operate in this sector if he does "any act of procuring" precious metals in Russia, which Axel, Fritz, and their company did when they engaged in transactions to purchase those precious metals. That conclusion follows from ordinary definitions of the word "procuring," which refer to efforts to obtain or acquire something, and that understanding of the term makes sense here. Moreover, even if plaintiffs themselves did not "procure" precious metals (which they did), the ultimate question is whether they *operated* in the metals and mining sector—which at a minimum plaintiffs did through their metal trading activities with others in that sector. And

11

OFAC's contemporaneous guidance confirms those understandings of both "procuring" and what it means to "operate" in the sector.

Plaintiffs nonetheless contend that "procuring" should be given an industry-specific meaning. But they fail to establish the metals and mining sector even has such an industry-specific meaning: their examples are all about a distinct term (procurement) and are just about the "mining" industry rather than the broader "metals and mining" sector. And even if there were a narrow industry meaning, it would make little sense for OFAC to have employed that meaning in this context where (1) individuals potentially outside that industry were evaluating whether their conduct was sanctionable, and (2) OFAC's sectoral determination was part of a much broader attempt to inflict economic pain on Russia in a wide variety of industries.

Plaintiffs also make an alternative argument based on the idea that the "geological materials" referenced in OFAC's guidance can only be metals and other substances that are in their natural state immediately after being removed from the earth. This argument is forfeited as it was not raised in district court. It is also erroneous. It is based on mistaken beliefs that words like "coal" and "precious stones" can only refer to unprocessed items and that actions like processing and refining can only occur on never-altered materials. Plaintiffs' new argument is also difficult to square with other language in OFAC's

12

contemporaneous guidance, including OFAC's description of the purposes served by its decision to include the metals and mining sector alongside a broad array of other sectors.

Plaintiffs lastly contend that OFAC lacked substantial evidence for its designation. But as plaintiffs recognize, significant portions of the administrative record contain classified information, which were filed *ex parte* for the district court's *in camera* review. This Court should review those *ex parte* materials, which confirm that substantial evidence supported OFAC's conclusions.

## STANDARD OF REVIEW

This challenge to agency action was decided on the administrative record, and the district court granted summary judgment to the government. This Court's review is *de novo*. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 507 (D.C. Cir. 2010).

In conducting that *de novo* review, this Court substantively applies the standards of the APA, under which agency action will be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "unsupported by substantial evidence," 5 U.S.C. § 706(2). This Court has specifically applied that deferential standard in OFAC sanctions cases. *See Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir.

13

2007) ("[O]ur review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential"); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003) ("[T]he highly deferential 'arbitrary and capricious' standard . . . does not allow the courts to undertake their own factfinding, but to review the agency record to determine whether the agency's decision was supported by a rational basis." (citation omitted)).

Plaintiffs wrongly suggest that notwithstanding the APA, this Court must substantively apply a "*de novo*" standard because OFAC's action was adjudicatory in nature.  Br. 14.  Plaintiffs' sole authority for this proposition is *National Organization for Women v. Social Security Administration*, 736 F.2d 727 (D.C. Cir. 1984) (per curiam); Br. 14, and plaintiffs fail to note that the page they rely on comes only from Chief Judge Robinson's concurrence, where he was writing for himself.  *See id.* at 737 (opinion of Robinson, C.J.).  The other two judges rejected the notion that *de novo* review was available in that case. *See id.* at 728 (per curiam) (explaining that the case was being remanded "in accordance with instructions set forth in the opinion of Circuit Judge Mikva and Senior Circuit Judge McGowan"); *id.* at 744-47 (Mikva & McGowan, J.J., concurring).  And while those judges offered thoughts on when *de novo* review might be available in an APA case, this Court later concluded that those

14

thoughts were "dicta," then specifically held that APA standards apply in OFAC sanctions cases. *See Zevallos v. Obama*, 793 F.3d 106, 112 (D.C. Cir. 2015); *see also id.* at 116-17 (explaining that sanctioned individuals are given "notice" after they are added to the sanctions list and then "a meaningful opportunity to be heard" through OFAC's administrative reconsideration process).

## ARGUMENT

### I.  OFAC Properly Interpreted The Phrase "Metals And Mining Sector" As Used In Its Own Federal Register Notice

1.  Under Executive Order 14024, the President authorized sanctions against entities that have operated in Russia's "technology" sector, "defense and related material" sector, or "any other sector of the Russian Federation economy as may be determined by the [Treasury] Secretary." 86 Fed. Reg. at 20249.  The Treasury Secretary, often acting through OFAC, subsequently extended these sanctions to a broad array of other sectors, including the "financial services," "aerospace," "electronics," "marine," "architecture," "engineering," "construction," "manufacturing," and "transportation" sectors of the Russian economy.  *See* 87 Fed. Reg. 32303, 32304 (May 31, 2022); 87 Fed. Reg. 32307, 32307 (May 31, 2022); 88 Fed. Reg. 36645, 36645-46 (June 5, 2023).  And in the determination at issue here, OFAC also extended these sanctions to Russia's "metals and mining" sector.  88 Fed. Reg. at 16887.

15

The lead plaintiffs' business activities show that they have operated in the "metals and mining" sector of the Russian Federation economy.[3]  In their complaint in this very case, Axel and Fritz acknowledged that they "have operated in the precious metals industry for over a decade" by focusing on "the trading of precious metals, including the acquisition and sourcing of such metals, as well as their sale."  JA8.  And as part of the designation process, OFAC explained that Axel, Fritz, and their company had performed these metal trading activities—on both the purchase and the sale sides—on behalf of clients in Russia and in connection with Russian precious metals, including by collaborating with "Russia-based metals companies to disguise[d] the origin of" those Russian metals" and/or by engaging in activities that "illicitly circumvent[ed] international sanctions."  JA95.  OFAC thus demonstrated that Axel, Fritz, and their company have operated in the metals and mining sector of the Russian economy.

---

[3] While lead plaintiffs Axel, Fritz, and Rheingold Edelmetall AG were sanctioned for having operated in the metals and mining industry, the other two plaintiffs (Rheingold Edelmetall GmbH and Liemeta AG) were sanctioned for the distinct reason that they were owned or controlled by Axel and Rheingold Edelmetall AG, respectively.  *See supra* pp.7-8.  Plaintiffs acknowledge that ownership or control.  *See* JA6-7.  Thus the the validity of OFAC's decision to sanction plaintiffs Rheingold Edelmetall GmbH and Liemeta AG turns solely on the validity of OFAC's decision to sanction plaintiffs Rheingold Edelmetall AG and Axel.

That common-sense conclusion also accords with OFAC's contemporaneous guidance.  At the time that OFAC included the "metals and mining" sector as one of the targeted sectors of the Russian economy, OFAC issued several FAQs on its website.  One of these, FAQ 1115, explained that OFAC expected to publish regulations defining the "metals and mining sector of the Russian Federation economy" to include "any act, process, or industry of extracting, at the surface or underground, ores, coal, precious stones, or any other minerals or geological materials in the Russian Federation," as well as "*any act of procuring*, processing, manufacturing, or refining *such geological materials,* or transporting them to, from, or within the Russian Federation." FAQ 1115 (emphases added).

Precious metals (which must initially be extracted from the earth) are undoubtedly "geological materials"—a point reinforced by the fact that OFAC's entire FAQ was meant to elucidate the term "metals and mining sector."  Moreover, Axel, Fritz, and their company all engaged in acts of "procuring" Russian precious metals because they engaged in transactions to purchase those precious metals (in addition to also concealing the source of those metals and/or illicitly circumventing international sanctions).  Also, Bernd Guenter Diegelmann, a Rheingold Edelmetall AG employee based in the United Arab Emirates, had worked to arrange the sale of Russian precious

17

stones in the United Arab Emirates, which is further evidence that Axel, Fritz, and their company had worked to "procure" the kinds of "geological materials" referenced by this FAQ. Plaintiffs' conduct was thus sanctionable.

That understanding also accords with the plain and ordinary meaning of the word "procuring," which refers to taking efforts to obtain or acquire something. *See, e.g.*, *Procure*, American Heritage Dictionary of the English Language (5th ed. 2022)[4] ("[to] get by special effort; obtain or acquire"); *Procure*, Merriam-Webster (last accessed May 16, 2025)[5] ("to get possession of (something): to obtain (something) by particular care and effort"); *Procure*, Cambridge Advanced Learner's Dictionary & Thesaurus (last accessed May 22, 2025)[6] ("to get something, especially after an effort"). Axel, Fritz, and Rheingold Edelmetall AG plainly engaged in efforts to obtain or acquire Russian precious metals and/or stones, easily fitting this definition. And that plain and ordinary meaning should control here. *See, e.g.*, *Huashan Zhang v. U.S. Citizenship & Immigration Servs.*, 978 F.3d 1314, 1319 (D.C. Cir. 2020) (because a regulation did not define a term, the appropriate approach was to give the term its "ordinary meaning"); *FTC v. Tarriff*, 584 F.3d 1088, 1090

---

[4] https://perma.cc/RN4B-WLUG.
[5] https://perma.cc/2XAA-BLZP.
[6] https://dictionary.cambridge.org/us/dictionary/english/procure?q=procuring.

(D.C. Cir. 2009) (articulating the basic principle that "words of statutes or regulations must be given their ordinary, contemporary, common meaning" (quotation marks omitted)).

Furthermore, even if the lead plaintiffs did not themselves "procure" Russian precious metals (which they did), the relevant question is whether these plaintiffs "have operated" in Russia's metals and mining sector. 88 Fed. Reg. at 16887. These plaintiffs would thus be eligible for designation if, for example, they had facilitative business dealings with *other* individuals who had procured Russian precious metals—a category that would surely include buying and selling those metals, and helping those individuals evade international sanctions on the trade in those metals.

OFAC's FAQ 1117—which OFAC issued on the same day it issued the FAQ with its anticipated definition of the "metals and mining sector"—further confirms that OFAC thought the type of conduct at issue here counts as "operating" in the metals and mining sector. The prompt for this FAQ asked whether a "company [that] provides goods or services to, or engages in trade with, persons that operate or have operated in the metals and mining sector of" the Russian economy is at "risk [of] being sanctioned by OFAC." FAQ 1117. OFAC's answer was that its determination "authorizes sanctions on any person determined to operate or have operated in the metals and mining sector

19

of the Russian Federation economy," but OFAC did "not intend to target persons for operating" in that sector "where the provision of goods or services is solely for the safety and care of personnel, protection of human life, prevention of accidents or injuries, maintenance or repair necessary to avoid environmental or other significant damage, or activities related to environmental mitigation or remediation." *Id.* The clear implication was that OFAC regarded the provision of goods or services to the metals and mining sector as *itself* counting as operating "in the metals and mining sector"—even if the provider did not itself remove geological materials from the ground or directly handle that geological material. To the extent OFAC was saying it did not plan to sanction people for providing a narrow category of goods or services, it was communicating this as a matter of discretion in certain health and safety-related situations. Plaintiffs' metal trading activities were of course not health-and-safety-related and surely qualify as providing the kind of services OFAC had in mind as operating in the metals and mining sector.

Further confirming OFAC's broad understanding of what it means to "operate" in the metals and mining sector is the agency's contemporaneous press release, which it issued when it added that sector to the already-large list of sectors targeted by Executive Order 14024. *See* Press Release, U.S. Dep't of the Treasury, *supra.* That release explained that OFAC determined to include

20

the metals and mining sector as part of the government's efforts "to diminish Russia's ability to continue" its war against Ukraine "and to procure the resources used to support it." *Id.* OFAC further explained that that by authorizing sanctions on the metals and mining sector, it was helping impose "economic costs on Russia" and was complementing existing sanctions in a variety of other sectors, including financial services, technology, aerospace, marine, electronics, and defense. *Id.* All of this suggests that OFAC intended to take an expansive view of what constituted the "metals and mining" sector, which would maximize the United States's ability to impose economic costs on Russia and hinder Russia's ability to wage war on Ukraine.

2. Against all of this, plaintiffs contend that OFAC created a surprisingly narrow understanding of the "metals and mining sector." As they argued in district court, plaintiffs claim on appeal that FAQ 1115's reference to "procuring" should be given an "industry-specific meaning." Br. 25. And in their view, within the metals and mining industry the term "'[p]rocuring' . . . does not include buying and selling" and instead refers to the process of "obtaining . . . materials and supplies necessary for extraction of geological materials." *Id.*

The first problem with this argument is that plaintiffs' citations do not actually establish that "procuring" has this industry-specific meaning. Instead,

21

their sources all refer to a different word: "procurement." *See* Br. 24 (citing four different articles discussing "procurement" for companies in the mining industry). The distinction matters. *Compare, e.g.*, *Procurement*, Cambridge Advanced Learner's Dictionary & Thesaurus (last accessed May 22, 2025)[7] (defining "procurement" as "the process of getting supplies"), *with Procure*, American Heritage Dictionary of the English Language (5th ed. 2022)[8] (redirecting "procuring" to the entry for "procure" and defining it as "[to] get by special effort; obtain or acquire"); *cf. Procurement*, Merriam-Webster (last accessed May 16, 2025)[9] (defining "procurement" either as "the act of procuring" or as "the purchasing, leasing renting, or selling of materials, services, equipment or construction"). Indeed, "[i]t is hard to make a term-of-art argument without the term of art." *Medical Marijuana, Inc. v. Horn*, 145 S. Ct. 931, 940 (2025); *see also id.* (faulting a party for relying on definitions of "injury" to define the term "injured").

Furthermore, the articles plaintiffs cite are not even about procurement in the "metals and mining sector" (the specific sector targeted by OFAC). Instead, they just about procurement by "mining" companies. *See* Br. 25-26. The phrase "metals and mining sector" is surely broader than just "mining"

---

[7] https://dictionary.cambridge.org/dictionary/english/procurement.
[8] https://perma.cc/RN4B-WLUG.
[9] https://www.merriam-webster.com/dictionary/procurement.

and fairly encompasses metals trading—as plaintiffs' own complaint in this case appeared to recognize. *See* JA8 (acknowledging that plaintiffs operate in the "precious metals industry").

It would also make little sense to use an industry-specific definition in this context. FAQ 1115 was designed to provide guidance to entities uncertain if they were operating in "the metals and mining" sector. It would thus be odd for OFAC to presuppose that the reader was *already* intimately familiar with industry-specific terminology. And that is all the more true when one considers that someone can be subject to sanctions under Executive Order 14024 even if they do not operate in the metals and mining sector, but nonetheless provide various forms of material support to entities that have operated in that sector and have not yet been sanctioned (but then subsequently become sanctioned). *See* 86 Fed. Reg. at 20250 (Executive Order 14024 § 1(a)(vi)(B)); *Bello v. Gacki*, 94 F.4th 1067, 1071-73 (D.C. Cir. 2024) (upholding OFAC's ability, under the closely related Kingpin Act, to sanction someone for materially assisting a not-yet-sanctioned third party in the performance of sanctionable activities). Many individuals evaluating whether they are providing material support in this manner are unlikely to be familiar with industry-specific terminology.

23

Plaintiffs' narrow interpretation also makes little sense in the broader context. In implementing Executive Order 14024, OFAC has targeted a broad array of sectors, including "financial services," "aerospace," "electronics," "marine," "architecture," "engineering," "construction," "manufacturing," and "transportation." *See supra* p.15. In that broad context, it is hard to fathom why OFAC would only want to target companies that work on or directly support geological extraction—and not the rest of the metals and mining industry. And plaintiffs' brief noticeably lacks an explanation for why OFAC would choose to hamstring its own designation power this way.

3. Plaintiffs' opening brief also makes an argument that they did *not* make in district court—that the phrase "geological materials" in FAQ 1115 only includes unrefined materials that were originally mined or extracted from the earth within Russia's boundaries. *Compare* Br. 19-23 (making this argument), *with* DE15-1 at 23-30 *and* DE20 at 7-16 (making different arguments).[10] The argument is forfeited and in any event lacks merit.

---

[10] The closest plaintiffs came was a brief argument in district court contending that a precious metal was not Russian unless it had been physically inside Russia at some point. *See* DE20 at 13-14, 16 (explaining that if a precious metal was neither extracted nor refined in Russia, it does not "become 'Russian' simply because [it is] owned or purchased by a Russian national"). This argument did not purport to interpret the term "geological materials," and appeared to recognize that some geological materials could be "Russian" even if first extracted from the earth in other counties.

It is forfeited because the argument was not first raised in district court. *See, e.g.*, *Abreu v. Howard Univ.*, 93 F.4th 498, 503 (D.C. Cir. 2024); *Keepseagle v. Vilsack*, 815 F.3d 28, 36 (D.C. Cir. 2016). It is "well settled" in this Court "that issues and legal theories not asserted at the District Court level" cannot ordinarily be asserted on appeal, as this rule protects judicial resources and avoids the "confusion and interminable delay" that would "result if counsel were permitted to appeal upon points not presented to the court below." *Keepseagle v. Perdue*, 856 F.3d 1039, 1053-54 (D.C. Cir. 2017) (quotation marks omitted). This Court thus need not consider the argument further.

The argument also lacks merit. FAQ 1115 stated that OFAC anticipated promulgating a regulation indicating the

> "metals and mining sector of the Russian Federation economy" . . . include[s] any act, process, or industry of extracting, at the surface or underground, ores, coal, precious stones, or any other minerals or geological materials in the Russian Federation, or any act of procuring, processing, manufacturing, or refining *such geological materials*, or transporting them to, from, or within the Russian Federation.

FAQ 1115 (emphasis added). The phrase "such geological materials" plainly refers to phrase "ores, coal, precious stones, or *any other* minerals or geological materials." *Id.* (emphasis added). And the use of the expansive term "any other"—in a definition that itself merely states what the defined term "include[s]"—makes clear that that OFAC meant the definition to reach

broadly.  The phrase is thus properly understood as reaching metals, precious stones, and other geological materials in both their immediate post-extraction state, as well as after being cut, refined, or otherwise manipulated after extraction.  *See, e.g.*, *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 218-19 (2008) (reading the phrase "any other" in a statute to have an "expansive" meaning); *iTech U.S., Inc. v. Renaud*, 5 F.4th 59, 64-65 (D.C. Cir. 2021) (finding the term "any other" in a statute to be so expansive that it overrode interpretive canons like *noscitur a sociis* and *ejusdem generis*).

Plaintiffs' interpretation would also lead to odd results.  For instance, there are many precious metal refiners who operate by refining jewelry and/or scrap materials to extract precious metals.  *See, e.g.*, Britannica*, Gold Processing: Refining*, https://perma.cc/5YDJ-7U9R; Elemetal, *America's Largest Precious Metals Refinery: How to Refine With Elemetal*, https://perma.cc/478G-Z3J9; Garfield Refining, *What Is Precious Metals Refining*, https://perma.cc/PQC4-7XLD.  And even just-mined metals and ores can go through an extensive, multi-stage process before pure metal is isolated, where most stages apply to materials that have already had some amount of refining or processing.  *See, e.g.*, The Natural Sapphire Company, *Platinum Mining & Refining*, https://perma.cc/ESL7-JLAE (detailing how extracted platinum ore is crushed and milled, then put through a "froth flotation process," then has air

pumped through it, then is dried and smelted, and then undergoes yet more refining and purification, to yield pure platinum).  If the term "geological materials" only encompassed precious metals that had never undergone any refining whatsoever, most steps in these processes would presumably be excluded—even though they are surely aspects of the "metals and mining" sector.

These examples also demonstrate that plaintiffs are simply wrong when they say that the FAQ's listed activities ("procuring, processing, manufacturing, or refining such geological materials, or transporting them," FAQ 1115) "all relate to the production of raw materials."  Br. 23.  To the contrary, as just demonstrated, activities like processing, manufacturing, and refining can all be performed on geological materials that are no longer in their natural state (and can even occur after they have become finished products, such as when finished jewelry is further refined to extract precious metals).  Moreover, transportation—which the FAQ also mentions—can clearly also be performed on finished products.  Plaintiffs even acknowledge that transportation can involve "the delivery of the manufactured product to the market," Br. 23, yet fail to explain how their interpretation of "geological materials" would reach such transportation activities.

27

Plaintiffs also err in claiming that the FAQ's reference to "ores," "coal," and "precious stones," FAQ 1115, "indicates that the geological material must . . . be found . . . in its natural state." Br. 20. The term "precious stones" can commonly refer to cut or otherwise processed stones, including those placed in finished jewelry. *See, e.g.*, *In re Omega SA*, 494 F.3d 1362, 1363 (Fed. Cir. 2007) (discussing a trademark application that referenced watches "set with precious stones"); *Government of Virgin Islands v. Edwards*, 903 F.2d 267, 272 (3d Cir. 1990) (discussing jewelry containing "precious stones"); *Herbert Rosenthal Jewelry Corp. v. Honora Jewelry Co.*, 509 F.2d 64, 65 (2d Cir. 1974) (per curiam) (discussing a copyright obtained for the design of a gold pin that "bears an oval cluster of round precious stones"); *United States v. 218 ½ Carats Loose Emeralds*, 153 F. 643, 644-45 (S.D.N.Y. 1907) (concluding that a person had failed to declare his possession of "precious stones" when he was carrying "cut emeralds"). Similarly, it is common to discuss burning "coal" for energy, even though coal is often processed before it is consumed. *See* U.S. Energy Information Administration, *Coal Explained* (last updated Feb. 16, 2023), https://perma.cc/PXX4-TJP7.

Plaintiffs' reference to OFAC's Iran sanctions only reinforces this point. As plaintiffs note, FAQ 831 provides a definition for the "mining" sector of Iran's economy, and that definition specifically references processes for

28

obtaining minerals and geological materials "from the Earth in Iran."  OFAC,

U.S. Dep't of the Treasury, *Iran Sanctions: FAQ 831* (Dec. 7, 2020),

https://perma.cc/6JXQ-5S39.  FAQ 1115 does not repeat that "from the

Earth" language, suggesting that OFAC intended a broader meaning.  And

that makes perfect sense: the Iran FAQ was just defining the "mining" sector,

while FAQ 1115 was concerned with the necessarily broader *metals and* mining

sector.

     Nor do plaintiffs achieve much by claiming that the term "geological

materials" typically refers to "unprocessed substances."  Br. 20-21.  They cite

two sources for this proposition, *see id.*, but neither establishes that this

meaning is even typical.  The first source, an online legal dictionary, appears to

have based its definition entirely on how the term "geological materials" is

defined in South Carolina's regulations about drinking water standards.  *See*

Law Insider, *Geologic Material definition*, https://perma.cc/D48Y-DBP8

(samples 1, 2, and 3).  The other source, from an organization that reports

about the health effects of building materials, merely purports to define the

term for purposes of that organization's own reporting system.  *See* Health

Product Declaration Collaborative, *The HPD Open Standard*,

https://perma.cc/3MCR-5SGU; Health Product Declaration Collaborative,

*Special Condition: Geological Material* (Feb. 23, 2018), https://www.hpd-

collaborative.org/wp-

content/uploads/2018/07/SpecialCondition_GeologicalMaterial.pdf.

Plaintiffs are on no firmer ground with their claim that the FAQ only

references geological materials first extracted from the earth within Russia's

boundaries.  Plaintiffs' argument appears to be premised on the incorrect

notion that the only "geological materials" referenced by the FAQ are

unprocessed.  *See* Br. 19-20.  In any event, the text of the FAQ references both

extraction activities "in the Russian federation" *and* "any act of procuring,

processing, manufacturing, or refining" geological materials "or transporting

them to from, or within the Russian Federation."  FAQ 1115.  The latter

clause clarifies that if the "procuring" or other covered activity occurs "within

the Russian Federation," it counts as being part of Russia's "metals and

mining sector."  *Id.* (quotation marks omitted).

4.  Plaintiffs offer a few remaining points that need not detain the Court

long.

First, plaintiffs offer an extended discussion of OFAC's actions under an

entirely different Executive Order.  But that discussion has no relevance here.

The Executive Order in question (14068) prohibited "the importation into the

United States" of various "products of Russian Federation origin as may be

determined by" the Treasury Department.  87 Fed. Reg. 14381 (Mar. 11,

2022). OFAC implemented this order in June 2022 by electing to prohibit the importation of gold from Russia, but the agency simultaneously decided not to have this bar apply to gold that at that time was already outside Russia's boundaries. *See* 87 Fed. Reg. 56590 (Sept. 15, 2022); *see also* OFAC, U.S. Dep't of the Treasury, *Russian Harmful Foreign Activities Sanctions: FAQ 1070* (last updated Dec. 22, 2023), https://perma.cc/YZB3-E3PR (explaining that *this* determination does not prohibit importation to the U.S. "of gold of Russian Federation origin that was located outside of the Russian Federation" before the determination was issued). OFAC subsequently (in early 2023) made a separate determination with respect to the "metals and mining sector," under an entirely different Executive Order (14024), and it is that later determination that is at issue here.

Plaintiffs' reliance on FAQ 1029 is also misplaced. *See* Br. 32-33. That FAQ about gold-related transactions was last updated in June 2022, before OFAC separately made its determination about the metals and mining sector under Executive Order 14024. *See* OFAC, U.S. Dep't of the Treasury, *Russian Harmful Foreign Activities Sanctions: FAQ 1029* (last updated June 28, 2022), https://perma.cc/V38E-BJYG (FAQ 1029). It is thus unsurprising that the FAQ does not address the effects of that later sectoral determination. And in any event, OFAC is not wrong to caution in FAQ 1029 that "[g]old-related

31

transactions involving the Russian Federation may be sanctionable under" Executive Order 14024.  FAQ 1029.  Most if not all such transactions are in fact sanctionable.

Plaintiffs next cite FAQ 980.  *See* Br. 29.  But that FAQ merely states the broad general policy OFAC follows when deciding whether to sanction someone who has provided material support to entities blocked under Executive Order 14024.  *See* OFAC, U.S. Dep't of the Treasury, *Russian Harmful Foreign Activities Sanctions: FAQ 980* (Feb. 24, 2022), https://perma.cc/3YJU-PVKC (FAQ 980); *see also* 86 Fed. Reg. at 20250 (Executive Order 1420 § 1(a)(vi)(B)).  It is not about any particular sector (let alone the metals and mining sector), nor does it state any firm guarantee or safe harbor about how OFAC will implement its discretion.  *See* FAQ 980.  And even if it did, that would at most demonstrate how OFAC applies the material support portions of Executive Order 14024.  It would not speak to OFAC's separate power to designate someone for operating in a targeted sector.

Plaintiffs also contend that it is not enough for them to have engaged in metal transactions with Russian nationals, and they maintain that the particular activity they were sanctioned for (*e.g.*, "procuring") had to have taken place "in the Russian Federation."  But absent other evidence, it would

32

certainly be fair for OFAC to presume that the Russian nationals with whom plaintiffs interacted were either located inside Russia, transacting in metals located in or eventually destined for Russia, or engaging in transactions on behalf of Russian companies—or some combination of these. If plaintiffs believe that all their transactions with Russian clients somehow managed to entirely bypass Russia's metals and mining sector, they are free to present that evidence to OFAC in a reconsideration petition.

Finally, plaintiffs offer an extended argument for why the Court should not defer to OFAC's interpretation of its own FAQ. *See* Br. 38-47. But just as was the case in the district court, *see* DE22 at 6, OFAC is not requesting any such deference here, and is merely contending that it has the best interpretation of the term "metals and mining sector."

## II. OFAC's Designations Were Supported By Substantial Evidence

As the International Emergency Economic Powers Act specifically contemplates, *see* 50 U.S.C. § 1702(c), OFAC's designations sometimes rely on classified information. Accordingly, in sanctions cases OFAC must sometimes redact portions of the administrative record when providing a copy to the plaintiff. *See Fares v. Smith*, 901 F.3d 315, 320 (D.C. Cir. 2018). If necessary for any required judicial review, OFAC can later tender the withheld portions

33

of the administrative record *ex parte*, for *in camera* review by the Court. *Id.* at 322-23.

In this case, OFAC followed that precise procedure and tendered the classified portions of the administrative record for *ex parte*, *in camera* review by the district court. We respectfully refer the Court to that filing—which we have reproduced in an *Ex Parte* Appendix filed in this Court—so the Court can see the full basis for the government's designation. *See generally* EA.

Plaintiffs recognize that the full basis for the government's designation is best understood by viewing the classified portions of the record alongside the unclassified portions. *See* Br. 47-48. They nonetheless offer several arguments for why they believe the administrative record lacks substantial evidence supporting their designation. Plaintiffs are mistaken.

First, plaintiffs express concern that the unclassified record does not specifically state that they were "procuring" metals. Br. 48. But the relevant question was whether plaintiffs operated in the "metals and mining sector," and there is no doubt that OFAC believed plaintiffs' metal trading activities with Russian individuals and entities qualified. *See* JA95. Moreover, the unclassified version of the administrative record shows that OFAC was aware of FAQ 1115 (and its treatment of the metals and mining sector) at the time it designated plaintiffs. *See* JA101 n.1.

34

Second, plaintiffs fault the district court for citing OFAC's press release in explaining why there was substantial evidence in the record supporting plaintiffs' designation. Br. 49-50. But this Court has specifically recognized that when key portions of the administrative record are classified or otherwise too sensitive to be disclosed to a sanctions target, OFAC's press releases and other unclassified summaries can provide the sanctioned individual with a "target" to shoot at when challenging his designation. *See Bello*, 94 F.4th at 1076. Thus regardless of whether the press release is itself standalone evidence, the press release nonetheless serves as an unclassified summary of at least some of OFAC's classified evidence, and so it is entirely proper for a court to rely on the press release for that purposes in an unclassified opinion (which is what OFAC understands the district court to have in effect done here, *see* JA210-13). In any event, OFAC has provided this Court with the classified evidence it relied on, which this Court can review to assure itself that OFAC's designation rested on substantial evidence.

Next, plaintiffs appear to take issue with OFAC's conclusion that Bernd Diegelmann (one of Axel's sons who was sanctioned alongside plaintiffs, but who is not a plaintiff in this case) arranged the sale of Russian precious stones in the United Arab Emirates while employed by Rheingold Edelmetall AG. *See* Br. 50 (contending the record has no "evidence that the Diegelmanns[] had

35

any business operations in the" United Arab Emirates).  As plaintiffs acknowledge, however, the unclassified record does have evidence that Bernd Diegelmann was at one point an executive board member with signing authority for plaintiff Rheingold Edelmetall AG.  *See* JA132.  The Court also has access to the classified portions of the record.

Finally, it bears emphasizing that if plaintiffs dispute OFAC's factual conclusions, plaintiffs are free to present their own evidence and argument through OFAC's reconsideration process.  Indeed, plaintiffs did precisely that on the same day they commenced this litigation, and their reconsideration petition is currently pending.

# CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

SHARON SWINGLE
 */s/ Benjamin M. Shultz*
BENJAMIN M. SHULTZ
*Attorneys, Appellate Staff*
*Civil Division, Room 7211*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3518*
*Benjamin.Shultz@usdoj.gov*

May 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7645 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Calisto MT 14-point font, a proportionally spaced typeface.

*/s/ Benjamin M. Shultz*
Benjamin M. Shultz

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*/s/ Benjamin M. Shultz*
Benjamin M. Shultz

**ADDENDUM**

## TABLE OF CONTENTS

50 U.S.C. § 1701 ................................................................................. A1

50 U.S.C. § 1702 ................................................................................. A2

31 C.F.R. § 501.807 ........................................................................... A5

31 C.F.R. § 589.325 ........................................................................... A7

**50 U.S.C. § 1701**

**§ 1701. Unusual and extraordinary threat; declaration of national emergency; exercise of Presidential authorities**

(a) Any authority granted to the President by section 1702 of this title may be exercised to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat.

(b) The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose. Any exercise of such authorities to deal with any new threat shall be based on a new declaration of national emergency which must be with respect to such threat.

**50 U.S.C. § 1702**

**§ 1701. Presidential authorities**

(a) In general

(1) At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe, by means of instructions, licenses, or otherwise--

(A) investigate, regulate, or prohibit--

(i) any transactions in foreign exchange,

(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,

(iii) the importing or exporting of currency or securities,

by any person, or with respect to any property, subject to the jurisdiction of the United States;

(B) investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States; and.1

(C) when the United States is engaged in armed hostilities or has been attacked by a foreign country or foreign nationals, confiscate any property, subject to the jurisdiction of the United States, of any foreign person, foreign organization, or foreign country that he determines has planned, authorized, aided, or engaged in such hostilities or attacks against the United States; and all right, title, and interest in any property so confiscated shall vest, when, as, and upon the terms directed by the President, in such agency or person as the President may designate from time to time, and upon such terms and conditions as the President may prescribe, such interest or property shall be held, used, administered, liquidated, sold, or otherwise dealt with in the interest of and for the benefit of the United States, and such designated agency or person may perform any and all acts incident to the accomplishment or furtherance of these purposes.

A2

(2) In exercising the authorities granted by paragraph (1), the President may require any person to keep a full record of, and to furnish under oath, in the form of reports or otherwise, complete information relative to any act or transaction referred to in paragraph (1) either before, during, or after the completion thereof, or relative to any interest in foreign property, or relative to any property in which any foreign country or any national thereof has or has had any interest, or as may be otherwise necessary to enforce the provisions of such paragraph. In any case in which a report by a person could be required under this paragraph, the President may require the production of any books of account, records, contracts, letters, memoranda, or other papers, in the custody or control of such person.

(3) Compliance with any regulation, instruction, or direction issued under this chapter shall to the extent thereof be a full acquittance and discharge for all purposes of the obligation of the person making the same. No person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant to and in reliance on, this chapter, or any regulation, instruction, or direction issued under this chapter.

(b) Exceptions to grant of authority

The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly--

(1) any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value;

(2) donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 1701 of this title, (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances; or2

(3) the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds. The exports exempted from regulation or

A3

prohibition by this paragraph do not include those which are otherwise controlled for export under section 46043 of this title, or under section 46053 of this title to the extent that such controls promote the nonproliferation or antiterrorism policies of the United States, or with respect to which acts are prohibited by chapter 37 of Title 18;

(4) any transactions ordinarily incident to travel to or from any country, including importation of accompanied baggage for personal use, maintenance within any country including payment of living expenses and acquisition of goods or services for personal use, and arrangement or facilitation of such travel including nonscheduled air, sea, or land voyages.

(c) Classified information.--In any judicial review of a determination made under this section, if the determination was based on classified information (as defined in section 1(a) of the Classified Information Procedures Act) such information may be submitted to the reviewing court ex parte and in camera. This subsection does not confer or imply any right to judicial review.

A4

**31 C.F.R. § 501.807**

### § 501.807. Procedures governing delisting from the Specially Designated Nationals and Blocked Persons List or any other list of sanctioned persons or property maintained by the Office of Foreign Assets Control

A person may submit a petition for administrative reconsideration pursuant to the procedures outlined below in order to seek removal of a person or property (e.g., a vessel) from the List of Specially Designated Nationals and Blocked Persons (SDN List) or any other list or identification of sanctioned persons or property maintained by the Office of Foreign Assets Control (OFAC):

(a) A person blocked under the provisions of any part of this chapter, including a specially designated national, specially designated terrorist, specially designated narcotics trafficker, or a person otherwise subject to sanctions pursuant to the provisions of any part of this chapter (each, a "sanctioned person"), or a person owning a majority interest in property (e.g., a vessel) that is blocked or otherwise subject to sanctions may submit arguments or evidence that the person believes establishes that insufficient basis exists for the sanction or that the circumstances resulting in the sanction no longer apply. The sanctioned person also may propose remedial steps on the person's part, such as corporate reorganization, resignation of persons from positions in a blocked entity, or similar steps, which the person believes would negate the basis for the sanction. A person owning a majority interest in property (e.g., a vessel) that is blocked or otherwise subject to sanctions may propose the sale of the vessel, with the proceeds to be placed into a blocked interest-bearing account after deducting the costs incurred while the vessel was blocked and the costs of the sale. This submission must be made via email to OFAC.Reconsideration@treasury.gov.

(b) For purposes of reconsideration petitions relating to persons or property sanctioned by OFAC:

(1) The information submitted by the person seeking removal of a person or property from the SDN List or any other list or identification of sanctioned persons or property maintained by OFAC will be reviewed by OFAC, which may request clarifying, corroborating, or other additional information.

(2) A person seeking removal of a person or property from the SDN List or any other list or identification of sanctioned persons or property maintained by OFAC may request a meeting with OFAC; however, such meetings are not required, and the office may, at its discretion, decline to

A5

conduct such meetings prior to completing a review pursuant to this section.

(3) After OFAC has conducted a review of the request for reconsideration, it will provide a written decision to the person seeking the removal of a person or property from the SDN List or any other list or identification of sanctioned persons or property maintained by OFAC.

**31 C.F.R. § 589.325**

**§ 589.325. Metals and mining sector of the Russian Federation economy.**

The term metals and mining sector of the Russian Federation economy includes any act, process, or industry of extracting, at the surface or underground, ores, coal, precious stones, or any other minerals or geological materials in the Russian Federation, or any act of procuring, processing, manufacturing, or refining such geological materials, or transporting them to, from, or within the Russian Federation.